# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 7:18-cr-0002 |
| v. | ) | |
| | ) | |
| ETHEN TANGTONG, | ) | By: Michael F. Urbanski |
| | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on defendant Ethen Tangtong's motion to suppress all statements made by him on December 17, 2017, and any evidence derived from those statements. ECF Nos. 32, 39. In his motion, Tangtong alleges that all incriminating statements and derivative evidence should be suppressed because: (1) a reasonable person would have believed he was in custody under the circumstances and thus Tangtong should have, but was not, provided with <u>Miranda</u> warnings; (2) even if <u>Miranda</u> warnings were not required, Tangtong's confession was involuntary due to, <u>inter alia</u>, the length of the interview and the alleged behavior of, and techniques employed by, law enforcement; and (3) both Tangtong and his mother invoked the right to counsel, but law enforcement did not suspend the interview. In its response to Tangtong's motion, the government contends that Tangtong's confession and the evidence derived therefrom should be admissible because (1) the interview was non-custodial and therefore <u>Miranda</u> warnings were not required; (2) Tangtong's statements were voluntarily made; and (3) the purported invocations of a request for counsel did not preclude law enforcement from continuing to interview the defendant. The court held an evidentiary hearing on October 16, 2018 on Tangtong's motion, during

which the court heard the testimony of Special Agents Hunter Durham and Jerre Harvard from the Department of Homeland Security – Homeland Security Investigations, and Aimee Tangtong, the defendant's mother. The court subsequently gave leave for the parties to file supplemental briefs addressing this testimony. On October 31 and November 14, 2018, respectively, Tangtong and the government filed supplemental briefs in support of their positions. Upon careful review of the record and for the reasons set forth herein, Tangtong's motion (ECF No. 32) is **DENIED**.

## I.

On December 12, 2017, Special Agents Hunter Durham and Jerre Harvard from the Department of Homeland Security – Homeland Security Investigations ("HSI"), along with Pulaski County Detective David Kressel and several other law enforcement officers, executed a search warrant on a home in Dublin, Virginia, where defendant Ethen Tangtong, 18 years old at the time, lived with his mother and sister. The search warrant was based a sworn affidavit asserting probable cause to believe that someone within the residence, likely Ethen Tangtong, was involved in the unlawful production, distribution, and/or advertisement of child pornography. More specifically, law enforcement identified an advertisement on a Russian-based Internet bulletin board seeking what Agent Durham described as "violent and sadomasochistic" child pornography. ECF No. 45, at 46. The advertisement was associated with a pseudonymous username and account, both of which were further associated with the email address etangtong17@gmail.com. The advertisement included so-called "teaser folders" with pictures of clothed underage children, including an image of a 7-year old child and other images taken inside a school. In addition to soliciting

child pornography, the user claimed to be in possession of "unseen footage" of underage

children and appeared to express a willingness to trade in such footage. The Internet

protocol ("IP") address associated with the advertisement returned to Comcast

Communications, an Internet service provider in Pulaski County. In response to a subpoena,

Comcast confirmed that the IP address belonged to one its subscribers, Aimee Tangtong,

defendant Ethen Tangtong's mother.

On December 11, 2017, United States Magistrate Judge Robert S. Ballou issued a

search warrant for the Tangtong residence. In accordance with "law enforcement protocol,"

Agent Durham decided to seek an interview with Ethen before conducting the search. ECF

No. 39, at 3. Two separate investigative teams were therefore established. The first team,

comprised of Agent Durham, Agent Harvard, and Detective Kressel, sought to interview

Ethen and gather generic information about who lived in the home and who used the

Internet on what devices. Agent Durham testified that he also sought any "admissions or

acknowledgments" regarding the suspected criminal activity taking place inside the home.

ECF No. 45, at 48. The second team, led by HSI Agent Chris Cummings, was tasked with

searching the home and included three or four additional officers. The search team was

positioned several blocks away from the Tangtong residence, "over the horizon," where they

awaited instructions from Agent Durham to begin the search. Id. at 50.

Sometime between 8:00 a.m. and 10:00 a.m. on December 12, 2017, the three-

member interview team, all but one of whom wore light body armor and visible firearms,

approached the Tangtong residence and knocked on the front door. Agent Durham

introduced himself to Aimee Tangtong, who answered the door, displayed his credentials,

3

and explained that he was hoping to speak with her son Ethen if he was home. They requested and received Ms. Tangtong's permission to enter the residence. It is unclear whether the officers were immediately allowed inside or whether, as Ms. Tangtong testified, she closed the front door and made them wait briefly on the stoop while she had a private conversation with Ethen in his bedroom. In any event, Ms. Tangtong woke Ethen from bed, and several minutes later, Ethen emerged from his bedroom into the living room wearing shorts, but no shirt. Agent Durham then identified himself to Ethen, again presented his credentials, and explained to Ethen that they wanted to speak with him about a computer crime. Id. at 53. The parties agreed to talk in the living room and sat collectively on several couches. Agent Durham testified that in order to spare Ethen the potential embarrassment of being interviewed about child pornography in the presence of his mother and to promote an open dialogue with Ethen, he asked that Ms. Tangtong leave the living room so that he could speak with Ethen alone. Id. at 40, 78-9. Ms. Tangtong complied, staying mostly in the adjacent kitchen and her basement bedroom. When asked if he "encouraged her [Ms. Tangtong] to remain out of the living room," Agent Durham stated, "I asked if we could speak with Ethen alone. I'm not sure I encouraged her to do anything. I just asked if we could speak to Ethen." Id. at 79. Agent Durham further testified that Ms. Tangtong possessed "freedom of movement throughout the house at all times," and indicated that she entered the living room multiple times during the interview to yell at her son. Id. at 56. Indeed, when asked whether the officers stopped her from going into the living room to talk to Ethen, Ms. Tangtong responded, "No, they asked me to calm down and step out of the living room. They didn't stop me, but they did try to, like, calm me down and get me to pull

4

myself together." Id. at 27, 29. When asked again whether the officers restricted her movements, she responded, "Not mine at all, no." [1] Id. at 35.

Agent Durham testified that his goal was to have a conversation with Ethen, and that to avoid "aggravat[ing] the situation," his tone throughout was "[c]alm, even-tempered, conversational, polite, [and] professional." Id. at 48, 53. While Agent Durham spoke with Ethen, Agent Harvard and Detective Kressel stood or sat nearby and took notes. Their firearms remained holstered, and there is no indication that the officers intimidated, threatened, or attempted to improperly induce Ethen into incriminating himself during the interview or anytime thereafter with promises of any kind. The officers never searched Ethen's person, nor was he handcuffed or otherwise restrained. Moreover, all the testimony suggests Ethen willingly engaged with law enforcement and was generally cooperative during the interview. Importantly, Ethen was not read Miranda rights before or during the interview.

Though Ethen was not entirely forthcoming at first, engaging in what Agent Durham described as "incremental truth telling," once informed of the search warrant, he became more truthful, stating at one point, "I've gotten myself into something. I know you get 15 years federally." Id. at 77. When Ethen expressed concern that he would be going to jail, Agent Durham reassured him that his purpose was to fact-find and that law enforcement was not there to arrest him that day. Indeed, Agents Durham and Harvard testified that they did not have an arrest warrant for Tangtong or any intention of arresting him because the

---

[1] Like much of her testimony, Ms. Tangtong's statements concerning her freedom of movement were at times contradictory. When she was on the phone with a secretary working for Ethen's guardian ad litem, Robin Kegley, she testified that Ethen did not overhear the conversation because "they would not let me and Ethen . . . be together." ECF No. 45, at 13. Ms. Tangtong also stated that "they wouldn't let me near Ethen after they got him pretty much alone. I wasn't allowed to be in the same room with him." Id. at 8.

"investigation hadn't determined with probability that he was the actual person within the residence that we would want to arrest." Id. at 55-56. Agent Durham testified that at the beginning of the interview, he told Ethen that he was not under arrest, was under no obligation to speak with him, and that, "[i]f you have somewhere to be, you're free to go."[2] Id. at 55. Ms. Tangtong's testimony corroborates the officers' testimony that they asked Ethen if he was willing to speak with them, and that Ethen agreed. Id. at 34.

Ms. Tangtong testified that approximately 20 minutes after Ethen first emerged from his bedroom, she went down to her room and tried to contact Ethen's guardian ad litem, Robin Kegley, who represented Ethen as a ward of the state in the foster care system and in other legal matters. Id. at 7. Ms. Tangtong was only able to reach Kegley's secretary. While she was in the kitchen, Ms. Tangtong claims to have put Kegley's secretary on speakerphone after the officers refused to take the phone from her. The secretary verbally admonished several of the officers that Ethen had the right to remain silent and consult with an attorney. There is no indication that Ethen was aware of the phone call or otherwise heard the admonishment. Indeed, Ethen concedes that he was not in the kitchen when this conversation took place. ECF No. 49, at 2. Agent Durham testified that earlier in the interview, Ms. Tangtong stated that "Ethen has an attorney from his previous problems" and asked "does he need an attorney?" ECF No. 45, at 58. Agent Durham advised Ms. Tangtong that he was unable to provide legal advice and that she was free to contact whomever she liked. Id. He also advised Ms. Tangtong that "[w]hoever that attorney is from

---

[2] Agent Durham testified that he asked Ethen if he was in school, and when Ethen responded that he was enrolled at a local community college, then asked if Ethen needed to be in class or anywhere else that day, "because that would have been relevant to the amount of time we had to interview him." ECF No. 45, at 55. According to Agent Durham, Ethen responded that he did not have class or anywhere to be.

6

the previous incident does not represent him on this matter here today." Id. In addition to Ms. Tangtong's alleged invocation of Tangtong's right to counsel, there is some dispute as to whether Ethen requested the presence of or asked whether he needed an attorney. The only evidence that he mentioned an attorney at all is Ms. Tangtong's exceedingly unclear testimony on this point, as the officers deny Ethen said anything about an attorney at any point. Initially, Ms. Tangtong testified that from behind the plywood door leading to her basement bedroom, she heard Ethen ask if his lawyer could be present and reassurances from the officers that he did not need an attorney. Id. at 10. Later, when asked again whether she ever heard Ethen ask for a lawyer, she responded, "I do not recall," "[y]ou would have to ask Ethen." Id. at 35. Finally, when asked yet again if she ever heard Ethen "say anything directly to the agents about wanting an attorney," she testified, "I thought he did, but now I'm confused, I thought he did." Id. at 37, 42.

The interview lasted around two hours, approximately 30 minutes into which Agent Durham advised Ethen that he had a search warrant for the residence and explained that additional officers would be arriving to conduct the search. Shortly thereafter, Agent Cummings and the search team entered the home and conducted the search. Agent Durham testified that once it was clear that the only part of the house in which Ethen lived was his "very small" bedroom, he informed "an officer or two" who were part of the search team that they were no longer needed. Id. at 63. It appears that no more than 6-8 officers were ever present at one time in the Tangtong residence. No member of search team participated in the interview. Agent Durham testified that although Ethen made several incriminating statements before the search team arrived, it was only after Ethen was told about the warrant

7

that the interview "reached the highest degree of truth telling." Id. at 64. Indeed, sometime after the arrival of the search team and toward the end of the interview, Ethen became increasingly emotional, and admitted to ownership of the bulletin board account and email address associated with that account, as well to possessing child pornographic images. Id. at 63-66. He showed Agents Harvard and Cummings where he had hidden the thumb drives on which he stored those images, stating that "Everything you want is on the drives." Id. at 63. Ethen also provided Agent Durham with passwords to email addresses and cell phones so that they could be accessed for forensic analysis. Ethen further offered to cooperate with law enforcement in their investigation of others, and while expressing concern that he was facing a lengthy prison sentence, suggested that he needed to go to jail.

Around the same time that the search team arrived, Ethen asked to use the bathroom. Agents Durham and Harvard testified that as soon as Ethen asked to use the bathroom, he was permitted to do so after the officers conducted a sweep for weapons, which they claim took "a few seconds." Id. at 52. Specifically, Agent Durham stated that he "advised [Ethen] to hold on a second because we need[ed] to search [the bathroom] before he went in." Id. There is no dispute that the officers kept the bathroom door cracked open so that they could "passively observe" what Ethen was doing inside. Id. Here, again, Ms. Tangtong's testimony is unclear. First, she testified that Ethen "kept saying he needed to use the bathroom," and that the officers "wouldn't let him." Id. at 19, 25, 40-41. Later, she stated that although Ethen was not permitted to use the bathroom "at first," he was allowed to do so after the officers searched the bathroom. Id. at 26. In any event, when the defendant finished using the bathroom, the interview continued in the living room.

8

The only physical interaction the officers claim to have had with Ethen was when he asked for a blanket and was handed one by Agent Durham. Agent Durham further testified that he "did not take a confrontational tone with Ethen early on or ever," and "do[esn't] recall accusing him of lying." Id. at 21, 69. Agent Durham stated that he "prefer[s] and ha[s] found that taking a professional and polite tone makes people respect what I'm doing more, and it shows respect for their household, and it ultimately results in a more productive . . . scenario." Id. at 68. While Ethen was initially reticent, at one point stating "I don't want to incriminate myself," there is no evidence that he ever asked to stop the interview or leave the residence. Id. at 77. In addition to recovering numerous electronic devices, officers also found women's' underwear and evidence of drug distribution, including scales, marijuana, and other paraphernalia. Ethen admitted to taking the underwear from his cousin and from his friends' mothers. It was around this time that Ethen began making suicidal statements, at which point the interview was concluded and Ethen was transported to a local psychiatric facility for evaluation.

## II.

The Fifth Amendment provides that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As a prophylactic safeguard for this constitutional guarantee, the Supreme Court has required law enforcement to inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001). The threshold issue the court must determine is relatively straightforward - whether the interview of Tangtong in his mother's living room constituted

9

"custodial interrogation" such that the <u>Miranda</u> warnings were required. If it did, then Tangtong's statements, which were made without the benefit of <u>Miranda</u> warnings, are inadmissible against him at trial in the prosecution's case-in-chief. <u>See Miranda</u>, 384 U.S. at 444; <u>Parker</u>, 262 F.3d at 419 ("Absent formal arrest, <u>Miranda</u> warnings only apply where there has been such a restriction on a person's freedom as to render him in custody."). If, however, the interview was non-custodial, then the statements are admissible provided they were made voluntarily.

The Supreme Court has described the test for whether an individual is "in custody" despite the lack of a formal arrest to be whether, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam)). The operative question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his situation" to be one of custody. <u>Id.</u> at 442. This determination is made by examining "all of the circumstances surrounding the interrogation" and determining "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (per curiam) (quoting <u>Berkemer</u>, 468 U.S. at 440); <u>United States v. Day</u>, 591 F.3d 679, 696 (4th Cir. 2010) (quoting <u>United States v. Weaver</u>, 282 F.3d 302, 312 (4th Cir.2002)). It is important to note that the environment does not have to be entirely free of coercion in order to be non-custodial—indeed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately

10

cause the suspect to be charged with a crime." Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). However, only when there is a custodial interrogation is it necessary for the police to provide the suspect with Miranda warnings. Id. (holding law enforcement officials are not required to administer Miranda warnings to everyone they question).

Given the fact-intensive nature of the custody inquiry, courts have emphasized that "the question whether an individual is 'in custody' must be made on a case-by-case basis." United States v. Jones, 818 F.2d 1119, 1123 (4th Cir. 1987). In United States v. Jefferson, the district court, after a thorough review of the voluminous case law addressing the question of custody, concluded that the following factors, while not individually determinative, are often the most salient in a custody determination: (1) whether the defendant was informed that he was not under arrest and the he was free to terminate the questioning; (2) whether the defendant possessed unrestrained freedom of movement during questioning; (3) whether the defendant voluntarily submitted to questioning; (4) whether the agents employed "strong arm tactics or deceptive stratagems" during questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the defendant was placed under arrest at the termination of the questioning. 562 F. Supp. 2d 707, 713–14 (E.D. Va. 2008); see also United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010) ("Among the facts to be considered are 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'"). In applying the Jefferson framework to the case sub judice, it cannot

11

be said that Tangtong was subject to restraints of the sort generally associated with formal arrest, and accordingly he was not in custody during the interview.

## A.

With respect to the first Jefferson factor, testimony from the October 16, 2018, evidentiary hearing indicates that Ethen was told explicitly and in no uncertain terms that he was not under arrest, under no obligation to speak with the officers, and free to terminate the interview at will if he had somewhere he needed to be. ECF No. 45, at 19, 55, 82. While informing a suspect that he is not under arrest is often a key element in determining a lack of custody, "it is not a talismanic factor," and "where the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive." Davis v. Allsbrooks, 778 F.2d 168, 171-72 (4th Cir. 1985); see also Jefferson ("Law enforcement officers may often remove doubt regarding the non-custodial nature of an interrogation by telling the person being interviewed that he is not under arrest and . . . is free to terminate the questioning). Where a defendant has been so advised, custody has frequently been found not to exist. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977); United States v. Colonna, 511 F.3d 431, 436 (4th Cir. 2007) (citing with approval United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) (noting that although advising someone that he or she is not under arrest mitigates an interview's custodial nature, "an explicit assertion that the person may end the encounter is stronger medicine")); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (significant to finding of lack of custody that [the suspect] was specifically informed that he was not under arrest). Indeed, affirmative statements that a defendant is free to leave are "highly probative of whether, in the totality of the circumstances, a reasonable person

12

would have reason to believe he was in custody" because such statements "go[] beyond the merely implied permission to leave" that accompanies a statement that one is not under arrest." United States v. Hargrove. F.3d 170, 180 (4th Cir. 2010). Taken together, Ms. Tangtong's testimony that the officers "reassured us that [Ethen] was not under arrest," ECF No. 45, at 17, 19, 34, 44, and the officers' testimony that they explicitly advised Ethen that he was under no obligation to speak with them and free to leave at any time, Id. at 55, 82, 86, cut squarely against finding that Ethen was in custody.

### B.

The second and third Jefferson factors ask whether Tangtong possessed unrestrained freedom of movement during questioning and whether he voluntarily submitted to questioning. With respect the second factor, Tangtong makes much of the fact that the officers (1) conducted a limited, precautionary sweep of the bathroom before allowing him inside, and (2) kept the door cracked open so that they could "passively observe" him. However, the court's review of the relevant precedent plainly establishes that the officers' (1) cursory search of the bathroom before permitting Tangtong to use it and (2) insistence on keeping the door partially cracked does not transform the otherwise consensual interview into a custodial one, especially where, as here, other indicia of custody are absent. Indeed, the Jefferson court noted that given the frequency with which law enforcement conduct interviews inside homes, courts are routinely confronted with the custodial implications of police conduct involving requests to use the bathroom. 562 F. Supp. 2d at 715. To the extent the officers' momentarily delaying Tangtong's use of the bathroom to conduct a protective search for weapons constituted a cognizable "restraint," it is the sort of de minimis

infringement on Tangtong's freedom of action that courts routinely conclude does not give rise to the necessity of <u>Miranda</u> warnings. <u>See, e.g.</u>, <u>United States v. Uzenski</u>, 434 F.3d 690, 705 (4th Cir. 2006) (finding no custodial interrogation where the interviewee was permitted to use the bathroom, the door to the room where the interview was conducted was left partially open at times, and the agents told him he was free to leave at any time); <u>Hargrove</u>, 625 F.3d at 174 (finding defendant was not in custody even though officers "cleared the residence making sure there was [sic] no officer safety issues, no weapons, making sure [they] identified all people on-scene and that . . . they] were safe"); <u>United States v. Jefferson</u>, 562 F. Supp. 2d 707, 716 (E.D. Va. 2008) (finding an in-home interview non-custodial even though officers followed defendant to the bathroom because such conduct is a "routine and precautionary measure to ensure agent safety and the integrity of the anticipated search")[3]; <u>United States v. Barmore</u>, No. 5:14CR41-07, 2015 WL 1585833, at *9 (N.D.W. Va. Apr. 9, 2015) (holding that the defendant was not in custody although certain constraints were placed on her ability to move about her home so that her movements would not interfere with the ongoing search); <u>United States v. Vidal</u>, 85 Fed.Appx. 858, 860, 862 (3d Cir. 2004) (concluding situation was non-custodial where suspect was permitted (1) "to move about the house, although only if accompanied by an agent," and "to use the bathroom by himself, but with the door partially ajar" and despite the fact that fourteen officers were present in home at time of questioning); <u>United States v. Welch</u>, 80 Fed.Appx. 7, 9 (9th Cir. 2003) (finding no custody where suspect allowed to move freely about the house "as long as she was accompanied by an officer to ensure the safety of [suspect] and the officers"); <u>United States</u>

---

[3] In <u>United States v. Jefferson</u>, the district court held that an agent's supervision of the defendant during his trip to the bathroom had minimal impact, absent something more, on the custody determination. 562 F. Supp. 2d 707, 716 (E.D. Va. 2008).

14

v. Faux, 828 F.3d 130, 137 (2d Cir. 2016) (finding that defendant not in custody although (1) she was not permitted to move freely about her home during the two-hour interrogation, (2) agents accompanied her to the bathroom and to her bedroom to fetch a sweater, and (3) her cell phone was seized for "officer safety" and "evidence preservation"); United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (finding the defendant was not in custody despite being "asked to stay seated in the living room and not allowed to move freely about the apartment"). Here, the officers did not accompany Tangtong into the bathroom, nor does the testimony on balance suggest that the officers unduly delayed Tangtong from using the bathroom as soon as he indicated a desire to do so, or otherwise restricted his freedom of action. Indeed, apart from the alleged delay in his use the bathroom, Tangtong does not claim that he was at any other point that his freedom was action was curtailed, or that he was verbally or physically restrained, handcuffed, or confined. Moreover, aside from voluntarily complying with the officers' request to speak with Ethen alone, the more convincing testimony suggests that Ms. Tangtong's freedom of movement was also not impaired in any meaningful way. Cf. United States v. Hashime, 734 F.3d 278, 284 (4th Cir. 2013) (noting that a family's loss of control over their home—such as being forced to stand outside—is suggestive of a custodial situation). In short, here, as in Jefferson, the officers' actions in response to Tangtong's request to use the bathroom do not represent the sort of restraint normally associated with formal arrest.

With respect to the third factor, the uncontroverted facts show that Tangtong voluntarily agreed to the interview before he was made aware of the search warrant, and continued to freely answer questions after he was apprised of said warrant. Typically,

15

"[c]ourts have been reluctant to find that an individual is in custody when he voluntarily agrees to a police request for questioning." Jefferson, 562 F. Supp. 2d at 716. Here, when the interview team first arrived at the Tangtong residence, they did not announce that they possessed or were there to execute a search warrant. ECF No. 45, at 34-36, 48-56, 82, 85-90. Instead, they simply asked Ethen if he would agree to an interview. Ethen consented and the parties collectively sat on several couches in the living room. Id. at 34. Importantly, Tangtong agreed to speak with the officers despite being informed that he was under no obligation to do so, was not under arrest, and that, "If you have somewhere to be, you're free to go." Id. at 55. Furthermore, as discussed in greater depth below, the decision to postpone advising Tangtong of the search warrant does not diminish the voluntariness of the interview or implicate Miranda. Indeed, "[p]loys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." United States v. Volious, No. 3:17-CR-00575-JMC, 2018 WL 1578816, at *5 (D.S.C. Apr. 2, 2018); see Oregon v. Mathiason, 429 U.S. 492, 495-96 (1977). While Tangtong at times became "highly emotional" and was initially hesitant to answer truthfully, he remained cooperative throughout the interview and never asked to terminate the questioning. Moreover, because Tangtong was not in custody, his statements to the effect that he did not want to incriminate himself did not preclude further questioning. Id. at 62. What is more, it is doubtful that such statements would qualify as "unambiguous invocations" of the right to remain silent for purposes of Miranda even if he was in custody. See, e.g., United States v. Liounis, 639 F. App'x 731, 736 (2d Cir.), cert. denied, 137 S. Ct. 528 (2016) (holding that "I don't want to incriminate myself" and other

16

statements expressing a reluctance to speak with authorities do not qualify as unambiguous);
Williams v. Sec'y for Dep't of Corr., 195 F. App'x 939, 941 (11th Cir. 2006) (holding that
defendant's statement that "[didn't] want to incriminate [himself]" was equivocal and
therefore not an invocation of his right to remain silent). In sum, that Tangtong was not
restrained in any significant way during the interview and voluntarily agreed to the interview
weigh decidedly against a determination that he was in custody.

## C.

With respect to the fourth and fifth factors under the Jefferson framework, there is
little evidence in record that the officers employed "strong arm tactics or deceptive
stratagems" while interviewing Tangtong or that the "atmosphere" was police-dominated. In
evaluating the fourth factor, the Jefferson court asserted that "using hostile tones of voice,
confronting the suspect with false or misleading witness statements, and employing good
guy/bad guy tactics" are the sorts of tactics antithetical to the Fifth Amendment guarantee
against self-incrimination and indicative of custody. Jefferson, 562 F. Supp. 2d at 716-17
(citing United States v. Griffin, 922 F.2d 1343, 1351 (8th Cir. 1990). Insofar as the record
accurately reflects the manner in which the officers conducted themselves inside the
Tangtong residence, they behaved professionally and respectfully. There is no indication that
they resorted to the sort of problematic or heavy-handed practices discussed in Jefferson and
proscribed by Miranda. Though the interview was at times fraught with emotion, it appears
to have been conducted in a generally cordial manner. Indeed, Agent Durham testified that
in order to avoid "aggravate[ing] the situation" and to "show respect for their household,"
his tone during the interview and in all his interactions with the Tangtongs was "[c]alm,

17

even-tempered, conversational, polite, [and] professional." ECF No. 45, at 53. Agent

Harvard similarly described Agent Durham's tone as "[v]ery professional and courteous,

calm, [and] collected." Id. at 88-90. There is no evidence that any of the officers employed

any coercive or overly deceptive tactics, or displayed open antagonism toward Tangtong. To

the contrary, the testimony indicates that when Tangtong asked for a blanket, he was

provided with one posthaste, and that as the interview progressed and Tangtong and his

mother became highly emotional, the officers responded professionally and sympathetically.

Id. at 57. In fact, Ms. Tangtong testified that "a lot of them [officers] kept coming in and

trying to console me, to get me to calm down." Id. at 20. Ms. Tangtong further testified that

Agent Harvard was "very friendly to my son." Id. at 21. There is no evidence that the

officers yelled or raised their voices. Even when Agent Durham believed that Tangtong was

not being truthful, he did not recall ever becoming confrontational or accusing Tangtong of

lying to him. Id. at 69. The officers never confronted Tangtong with their firearms drawn,

frisked anyone in the home, conducted a protective sweep of the entire residence when they

first arrived, or improperly induced Tangtong into incriminating himself.[4] Id. at 89. From the

outset, Agent Durham informed Tangtong that they were investigating a "computer crime."

See United States v. Braxton, 112 F.3d 777, 784 (4th Cir. 1997) (holding that there is no duty

to advice a defendant of the identity of the specific offense under investigation); United

States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987) (holding that "[s]ilence by a

government agent can only be equated with an affirmative misrepresentation where there is a

legal or moral duty to speak or where an inquiry left unanswered would be intentionally

---

[4] Agent Durham testified that Tangtong at one point offered to assist law enforcement before this possibility was broached by any of the officers. ECF No. 45, at 76. Agent Durham testified that he did not himself propose cooperation or at any point make any promises related to cooperation. Id.

18

misleading"). In short, the court finds no evidence of the sort of "tactics" or "stratagems" described in Jefferson that would lead a reasonable person, despite being told he was not under arrest and free to leave if he so desired, to feel as though those statements were not true.

Further militating against a finding of "custody" is the fact that Tangtong was interviewed in his own home. While the "setting of the interview is not singularly dispositive, an interview at a suspect's residence tends to be more neutral than one that occurs at a law enforcement facility." Indeed, interviews conducted in the familiar surroundings of one's own home are generally not deemed custodial. Beckwith v. United States, 425 U.S. 341, 341-46 (1976) (holding that a suspect interviewed for three hours in his home was not in custody where the conversation was described as "friendly" and "relaxed" because being the focus of an investigation alone does not involve the inherently coercive pressures that Miranda described as inherent in incommunicado custodial interrogation); Hargrove, 625 F.3d at 180-81 (holding that suspect interviewed in "comfortable atmosphere" in his home was not in custody); United States v. Parker, 262 F.3d 415 (4th Cir.2001) (holding that suspect interviewed at 5:30 a.m. in her home was not in custody for Miranda purposes where officers informed her that she was not under arrest, she was not handcuffed or otherwise restrained, officers did not draw their weapons, and a relative entered the interview room on at least two occasions); United States v. Braxton, 112 F.3d 777, 785 (4th Cir. 1997) (reaffirming that a suspect was not in custody and holding that his incriminating statements made around the kitchen table in his mother's home were not involuntary even though an officer stated "you're not coming clean"); see also United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir.

19

1994) (explaining that "[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings"); United States v. Lamy, 521 F.3d 1257 (10th Cir. 2008) (holding that questioning in the "common area of his home, during which his mother came and went from the room" was not custodial). Here, the fact that Tangtong was interviewed in an open atmosphere in his own home, with his consent, again weighs against a finding of custody.

Finally, courts have found each of those factual circumstances not already addressed which Tangtong claims engender a police-dominated, coercive atmosphere, to be insufficient, individually or in the aggregate, to support a finding of custody.[5] In short, that Tangtong was (1) the focus of the investigation, (2) confronted by multiple officers with visible, but holstered, firearms, (3) awakened from his sleep, and (4) interviewed in a separate room from his mother, do not, individually, or collectively, implicate Miranda. Indeed, many of the facts alleged above are similar, but ultimately less favorable vis-à-vis a finding a custody, to those in United States v. Hargrove. F.3d 170, 185 (4th Cir. 2010). In Hargrove, which also involved a child pornography investigation, a team of around 10-15 armed officers executed a search warrant on Hargrove's home shortly after 6:00 a.m. Id. at 173-74. Two officers interviewed Hargrove, who was dressed in pajamas, around his kitchen table while the search was underway. There, as here, one of the interviewing officers "did not simply refrain from telling Hargrove that he was not free to leave, but explicitly informed him that he could leave." Id. at 173-78, 180. Yet, there were several factual circumstances

---

[5] In United States v. Parker, the Fourth Circuit held that a 30-minute interview with two agents in a bedroom with the door closed was not custodial where six or seven agents arrived at the defendant's home in the early morning hours, the defendant was neither handcuffed nor restrained, no weapons were drawn in her presence, one of her relatives requested to enter the bedroom during the questioning and was allowed to do so twice, and the defendant was not forced to go into the room with the officers and was never told that she was not free to leave. 262 F.3d 415, 417-19 (4th Cir. 2001).

present in <u>Hargrove</u> supporting a finding of custody that are absent here, including that: (1) some of the officers had their weapons drawn when they entered Hargrove's home; (2) those officers that were not part of the entry team conspicuously surrounded the perimeter of the house; (3) Hargrove alleged one officer blocked the exit to the kitchen while another positioned himself between Hargrove and the back door; (4) Hargrove was subjected to a pat-down search and claimed he felt intimidated by having "a bunch of armed officers around"; (5) he was prevented from retrieving cigarettes or speaking with his daughter because, at the time those requests were made, they would have interfered with the search of his home specifically and investigation generally.[6] <u>Id.</u> at 172-85. The Fourth Circuit held that despite these aggravating facts, the totality of the circumstances still "support[ed] the finding that a reasonable man in Hargrove's position would have understood that he was not 'in custody.'" <u>Id.</u> at 182.

That the interview became more productive after Tangtong was apprised of the warrant does not change this analysis. Nor does the fact that Tangtong was the focus of the investigation. <u>Beckwith,</u> 425 U.S. at 346–47 (noting that it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the [c]ourt to impose the <u>Miranda</u> requirements with regard to custodial questioning"); <u>United States v. Manor,</u> 936 F.2d 1238, 1241 (11th Cir. 1991) ("<u>Miranda</u> is not implicated simply because an individual is the subject

---

[6] The Fourth Circuit described the officers' preventing Hargrove from retrieving cigarettes from his computer desk in bedroom and from speaking with his daughter while she was being interviewed by other officers as "minor" limitations on his freedom of movement. <u>United States v. Hargrove,</u> 625 F.3d 170, 181 (4th Cir. 2010). The Fourth Circuit further held that because evidence in the record showed that Hargrove was permitted to move about his house when it did not interfere with the ongoing search, it cannot be said that Hargrove's conduct was curtailed to a "degree associated with formal arrest." <u>Id.</u>

21

or target of an investigation."). Tangtong voluntarily agreed to submit to questioning for approximately thirty minutes before he learned of the warrant, and did not express a desire to terminate the interview at any point thereafter. That the revelation of the existence of the search warrant may have inspired Tangtong to become more forthcoming and truthful is of no moment. In Hargrove, the court was unmoved by Hargrove's testimony that his willingness to speak with the officers was at least partly attributable to his resignation to the fact that, "at that point I figured I was going to jail, [and talking to them] didn't make any difference one way or another." 625 F.3d at 182. From the Fourth Circuit's perspective, what mattered was that "Hargrove never asked for the interview to end, never objected to any of the questions, and remained 'polite' and cooperate' throughout the period." Id. Indeed, it is well-settled that "[c]ustody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead [on] the objective circumstances of the interrogation." Parker, 262 F.3d at 419. In other words, here, as in Hargrove, Tangtong's subjective state of mind after being informed of the search warrant – whether he was confused or panicked – is irrelevant to the custody inquiry. The court agrees with counsel for the government that "feeling like one is in trouble does not equate with one feeling like they are in custody." ECF No. 45, at 111. In sum, given the factual circumstances subsumed in the holding in Hargrove, which was a "harder" case in many respects, it cannot be said that any of the facts presently before the court produced an atmosphere that was so police-dominated or replete with coercive pressures as to compel a different result from that in Hargrove.[7]

---

[7] The government is correct that this case is a far cry from other cases where the Fourth Circuit has held that the totality

**D.**

With respect to the sixth and final factor identified in Jefferson, i.e., whether the

defendant was placed under arrest at the termination of questioning, Tangtong, although not

formally arrested at the conclusion of the interview, was ultimately arrested later the same

day. The Jefferson court held that "it is significant to the custody determination whether the

suspect was in fact arrested at the conclusion of the interrogation" because "[f]ormal arrest

at the conclusion of an interrogation indicates that a suspect would not have been free to

terminate questioning or to leave the scene." 562 F. Supp. 2d at 718 (citing Griffin, 922 F.2d

at 1355 ("[W]e believe [the suspect's] arrest at the conclusion of the interview is objective

evidence which tends to support the reasonableness of [the suspect's] subjective belief that

he was in custody from the inception of the encounter and that his arrest was imminent.").

The government avers that the arrest was unanticipated. The officers' testimony that they

had no intention of arresting Tangtong the day of the interview, and repeatedly stated as

much to him and his mother, while of course not dispositive, partly corroborates this claim.

of the circumstance indicated that a defendant was "in custody" during police questioning in his home. In United States
v. Hashime, for example, the Fourth Circuit held that an in-home interrogation of a 19-year old child pornography
suspect was custodial. 734 F.3d 278, 280–81 (4th Cir. 2013). In that case, a team of 15-30 law enforcement officers,
equipped with a battering ram, "streamed" into the defendant's home with their guns drawn, went to the defendant's
bedroom, pointed a gun at him, "held Hashime by the arm, issuing orders to him, and marched him out to the front
lawn" in what was described by the Fourth Circuit as a "harrowing scene." Id. at 284. The Hashime family was
"corrall[ed]" in the front lawn in the cold, some of its members dressed only in nightclothes. Id. at 280. Two officers
then escorted the defendant to a small storage area in the basement for interrogation, where he was separated from his
family and interrogated for three hours. Id. at 285. Furthermore, the officers told Hashime that he had to remain under
guard, and despite telling him that he did not have to answer their questions, was not under arrest, and could leave, also
told him that they needed to know the truth and he needed to be completely honest even if he was afraid or did not
want to answer the questions. Id. at 282-86. In United States v. Colonna, another case involving child pornography and
an in-home interview, the Fourth Circuit held that the defendant Colonna was "in custody," citing the fact that, among
other things, he was awakened when police kicked open his bedroom door and, at gun point, ordered him to dress and
come downstairs. 511 F.3d 431, 436–37 (4th Cir. 2007). Colonna's home was "inundated with approximately 24
officers," who controlled where Colonna and the other individuals sat and restricted their access to the home. Id.
Moreover, Colonna was subject to a three-hour, "full-fledged interrogation" which took place outside his home in a
police vehicle where he was flanked and closely guarded by several agents. Id. at 435. Colona was also never told that he
was free to leave or that he did not have to respond to questions. Id.

23

Agent Durham testified that as Tangtong became more emotional and began talking about killing himself, he first said something to the effect of, "Look, I know you're stressed out, I know that this seems like a lot, but let's just take a deep breath and . . . get through today and let's talk about this." ECF No. 45, at 65. It was only after Tangtong continued making suicidal statements that the officers decided to transport him to a psychiatric facility for an evaluation. Ultimately, Tangtong was not detained by the medical facility, and after consulting with counsel for the government, and in light of (1) concerns regarding suicide risk, (2) the substantial evidence collected regarding Tangtong's possession of child pornography, and (3) Ms. Tangtong's statements to officers that Ethen was not allowed to come back home, ECF No. 45, at 37, the decision was made to arrest Tangtong. Insofar as Tangtong's ultimately being arrested informs the court's custody determination, it is not particularly probative vis-à-vis the reasonableness of Tangtong's subjective belief that he was in custody given the officers' repeated declarations to the contrary and sequence of events leading up to its effectuation. Thus, as applied in this case, the sixth Jefferson factor neither weighs in favor of or against a finding of custody.

In sum, application of the Jefferson factors and consideration of the totality of the circumstances establish that the interview was non-custodial. Tangtong was told explicitly that he was not under arrest, under no obligation to speak with the officers, and was free to leave. Tangtong voluntarily submitted to questioning, and was unrestrained throughout. No "strong arm tactics or deceptive stratagems" were employed, and the atmosphere was not police-dominated such that a reasonable person in Tangtong's position would have understood that he was in custody. Lastly, rather than being placed under arrest at the end of

24

the interview, the officers took Tangtong to the hospital after he began expressing a desire to harm himself. Therefore, it cannot be said that Tangtong was subject to restraints of the sort typically associated with formal arrest. It follows that Tangtong was not entitled to be apprised of his rights under <u>Miranda</u>, and his statements are not subject to suppression under <u>Miranda</u> and its progeny.

## II.

Even where <u>Miranda</u> warnings are not required, a statement, to be admissible, must have been made voluntarily. <u>United States v. Hasan</u>, 747 F. Supp. 2d 642, 656–57 (E.D. Va. 2010) (<u>citing</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). Tangtong, citing essentially the same facts used to support his <u>Miranda</u> claim, contends that his statements are inadmissible because they were not made voluntarily under the Fifth Amendment, which guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself ... without due process of law." U.S. Const. amend. V; <u>accord</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 7 (1964) (holding that when "a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the [C]onstitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself'" (<u>quoting</u> <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897))). Instead, Tangtong alleges his statements were the product of a "carefully orchestrated interview setting designed for the specific purpose of convincing him that it was in his best interests to incriminate himself, to overcome his reluctance to incriminate himself." ECF No. 49, at 5. More specifically, Tangtong cites the following facts as rendering his confession involuntary: (1) the number of armed law enforcement officers

present, (2) their attitude towards him and his mother, (3) his separation from his mother, (4) the officers alleged "efforts to thwart attorney representation during the critical time of the interrogation," ECF No. 32, at 2, (5) the length of the interrogation, (6) the officers' awareness of his emotional problems, and the (7) "psychological interrogation techniques utilized." Id. at 2. Tangtong asserts that under such circumstances, "[t]o say that his statements . . . were 'voluntary' is to put a very strained meaning on the word voluntary." ECF No. 49, at 5. The court disagrees, and does so for many of the same reasons that it disagrees with Tangtong about whether he was in custody under Miranda.

A statement is involuntary under the Fifth Amendment only if it is "involuntary" within the meaning of the Due Process Clause. See Oregon v. Elstad, 470 U.S. 298, 304 (1985) (citing Haynes v. Washington, 373 U.S. 503 (1963); Chambers v. Florida, 309 U.S. 227 (1940)). The test for determining whether a statement is voluntary under the Due Process Clause "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram, 168 U.S. at 542–43). In Colorado v. Connelly, the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." 479 U.S. 157, 167 (1986). The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. United States v. Braxton, 112 F.3d 777, 780–81 (4th Cir. 1997). The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" United States v. Pelton, 835 F.2d

26

1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973));
see also United States v. Dodier, 630 F.2d 232, 235–36 (4th Cir. 1980) (evaluating the
voluntariness of a confession based on whether it is the "product of an essentially free and
unconstrained choice by its maker"). Any statement given freely and voluntarily without any
compelling influences is admissible in evidence. See Miranda v. Arizona, 384 U.S. 436, 478
(1966). The government bears the burden of proving by a preponderance of the evidence
that the statement was voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972).

   To determine whether a defendant's will has been overborne or his capacity for self-
determination critically impaired, courts must consider "the 'totality of the circumstances,'
including the characteristics of the defendant, the setting of the interview, and the details of
the interrogation." Pelton, 835 F.2d at 1071 (quoting United States v. Wertz, 625 F.2d 1128,
1134 (4th Cir. 1980)); accord Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977) (per
curiam) (holding that "a finding of coercion and involuntariness must be based upon a
careful consideration of the totality of the circumstances" (citing Schneckloth, 412 U.S. at
226)); see also Haynes, 373 U.S. at 513–14 (noting that appellate court must review the
totality of circumstances surrounding the statement). In discussing coercive conduct that
rendered statements involuntary, the Fourth Circuit has noted the following examples: (1)
physically harming or threatening to harm the defendant if he or she refused to answer
questions; (2) depriving the defendant of clothes, food, sleep, or contact with others; (3)

27

lengthy periods of questioning or isolation; and (4) deceptive conduct. See United States v. Braxton, 112 F.3d 777, 784-85 (4th Cir. 1997) (collecting cases).[8]

Here, the totality of the circumstances demonstrate that Tangtong's statements were "voluntary" for constitutional purposes. There is no evidence in the record that any of the officers harmed or threatened to harm Tangtong if he did not answer their questions, or made any express or implied promises, or that his statements were the result of coercion or undue influence. See, e.g., Beecher v. Alabama, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); Payne v. Arkansas, 356 U.S. 560, 564–65 (1958) (statement obtained after police threatened to turn suspect over to an angry mob). Nor is there any evidence that Tangtong was subjected to any physical conditions that caused discomfort or that any officer intimidated or deprived Tangtong of anything. To the contrary, when Tangtong indicated that he was cold and asked for a blanket, he was provided with one, and when he asked to use the bathroom, he was permitted to do so. See, e.g., Malinski v. New York, 324 U.S. 401, 403 (1945) (statement obtained after forcing suspect to remain naked); Reck v. Pate, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); Brooks v. Florida, 389 U.S. 413, 414–15 (1967) (statement obtained after depriving suspect of food and keeping suspect naked in a small cell); Blackburn v. Alabama, 361 U.S. 199, 207–08 (1960)

_____

[8] In United States v. Braxton, the Fourth Circuit thoroughly examined the voluntariness requirement, ultimately reversing the district court's finding that statements made during an interview around the defendant's kitchen were involuntary. 112 F.3d 777 (4th Cir. 1997). More specifically, the Fourth Circuit held as follows: (1) the officers' interrogation of defendant was not made unlawful by fact that they told him when they arrived at his mother's home that they "needed" to ask him some questions; (2) the officer's repeated statement during interview that "you're not coming clean" was not coercive conduct that rendered confession involuntary; (3) the statement that defendant could face five years in jail was not an implied promise; (4) officer who suggests to suspect that he tell the truth or face consequences need not also inform suspect that he has right to remain silent; (5) statement was not involuntary on basis that officers did not inform defendant of charges they were investigating.

(confession obtained after interrogation of eight to nine hours in a "tiny room" that was only "occasionally" lit, but was "literally filled with police officers", and where the defendant was prevented from seeing/speaking with friends or family).

With respect to those facts that Tangtong specifically avers rendered his statements involuntary, none change the court's conclusion that Tangtong's statements were made voluntarily. Nevertheless, the court will address those facts seriatim. Tangtong alleges that the number of armed law enforcement officers present and their attitude towards him and his mother supports a finding of involuntariness. Yet, at most, only three officers interviewed Tangtong. Those officers who arrived later to conduct the search did not participate in the interview.[9] Interviews conducted concurrently with the execution of search warrants involving a far greater number of officers are routinely held to be voluntary. See, e.g., United States v. Hargrove, 625 F.3d 170, 173–74 (4th Cir. 2010); Braxton, 112 F.3d at 779–83 (4th Cir. 1997). As for the officers' "attitude," Tangtong does not specify what attitude purportedly was used, and provides no factual support for the implication that the officers were overly aggressive or accusatory such that his will was overcome. Ms. Tangtong's testimony indicates quite the opposite, suggesting that the officers were professional and respectful while inside her home and maintained a conversational and even-keeled disposition throughout the interview. Indeed, at the conclusion of the interview and search, Ms. Tangtong thanked at least one of the officers for his cooperation. ECF No. 45, at 36. To the extent there was a coercive aspect to the interview, it did not exceed that which

---

[9] To the extent Tangtong claims that the agents being armed turned the consensual interview into a custodial one, he is effectively arguing that either law enforcement officers must risk being unarmed when interviewing a suspect, or else turn every interview into a custodial one. The court agrees with the government that this is neither reasonable nor accurately reflects the law.

29

is intrinsic and unavoidable in such situations. Though Ms. Tangtong was asked to leave the living room and did so for some period of time, there is no evidence of the sort of forceful, prolonged, and complete separation from family under threat of force or intimidation which other courts have found problematic. See, e.g., Hashime, 734 F.3d at 283 (finding of custody where suspect was isolated from his family members during three-hour interrogation and family members' repeated requests to see defendant were denied). Ms. Tangtong voluntarily complied with the officers' initial request to speak with Ethen alone, and her testimony indicates that she was still permitted to move within the home as she pleased. In sum, the officers' entered the Tangtong residence with Ms. Tangtong's consent, interviewed Ethen with his consent, and maintained a conversational, even-tempered tone during the interview.

With respect to the purported efforts by the officers to "thwart attorney representation," as discussed in greater depth infra, there is no credible evidence that any of the officers tried to prevent or dissuade Ethen or Ms. Tangtong from contacting an attorney or otherwise mislead them regarding their right to do so. While Ms. Tangtong sought to contact Ethen's guardian ad litem, who represented him in the foster care system and in other matters, there is no evidence that Ethen was aware of that fact. Forasmuch as the voluntariness inquiry is based on what Ethen knew, Ms. Tangtong's own attempt to contact an attorney – a fact about which Ethen had no knowledge – does not impact the voluntariness of his statements made during a non-custodial interview. See Moran v. Burbine, 475 U.S. 412, 413, 425 (1986) (holding that police are not required to inform a suspect of an attorney's efforts to reach him and that events occurring outside of a suspect's presence and entirely unknown to him can have no bearing on voluntariness). With respect

to the length of the interview, it was neither a "marathon session designed to force a confession" nor particularly lengthy. Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (holding that statements made during a non-custodial interview at a police station lasting two hours were made voluntarily); see United States v. Locklear, 829 F.2d 1314, 1317 (4th Cir. 1987) (confession voluntary where "the interviews were not an exercise in endurance" and "[t]he longest meeting lasted approximately two hours"); but see Ashcraft v. Tennessee, 322 U.S. 143, 149–50 (1944) (holding that confession made by defendant held incommunicado and interrogated for thirty-six hours "without sleep or rest" by "relays of officers, experienced investigators, and highly trained lawyers" was involuntary); United States v. Williams, 258 F. Supp. 3d 633, 639 (D. Md. 2017) (holding that inculpatory statements made during a two-hour interview following sixteen hours of confinement during which it was unclear if defendant slept or received his blood pressure medication were not made voluntarily). This case is readily distinguishable from the lengthy interrogations during incommunicado detention that have been held to result in involuntary confessions. Indeed, there is no evidence that Tangtong was ever detained at all during the execution of the warrant.

Furthermore, as for the officers' alleged awareness of Tangtong's "emotional problems" and use of "psychological interrogation techniques" to overcome his will, it is unclear, as initial matter, as to which problems or techniques Tangtong is referring. To the extent the decision to delay informing Ethen about the search warrant constitutes a "technique," it was neither unlawful nor sufficient to vitiate the voluntariness of his confession. In United States v. Hunter, the court held that incriminating statements made by

31

the defendant during an interview related to a "shaken-baby" syndrome investigation were voluntary despite the fact that she was "subjected to skillful manipulations and deceptions" by an officer whose "actions were intentionally designed to obtain incriminating statements without signaling to the defendant the seriousness of her situation or the jeopardy she faced." 912 F. Supp. 2d 388, 397-98 (E.D. Va. 2012). The investigating officer in Hunter did not inform the defendant, who was in her early twenties, that she had acquired information that called into question her version of events and admitted to "misrepresent[ing] how she viewed the seriousness of Hunter's criminal exposure to induce her to stay and cooperate." Id. at 397. The investigator also "made a conscious decision not to provide a Miranda warning precisely because she knew that it might cause Hunter not to talk or cooperate." Id. Moreover, the investigating officer "repeatedly pressed Hunter to reconsider her version of events." Id. Notwithstanding intentional efforts to minimize the seriousness of Hunter's criminal exposure, "which certainly had the potential to cause [her] to discount her own assessment of her jeopardy," these "tactics did not cause in Hunter a level of mental coercion sufficient to render her statements involuntary" and "[s]uch a ploy, effective as it is to cause reflection and remorse . . . was not so manipulative as to overcome Hunter's capacity to engage in critical self determination as to whether to provide the requested information." Id. at 400. Indeed, the court noted that "appellate decisions in this circuit and elsewhere permit, as a result encourage, that kind of conduct." Id. at 398. Here, as in Hunter, to whatever extent the officers "turned up the heat by telling [Ethen] they had a search warrant," ECF No. 49, at 5, this conduct does not rise to the level of psychological manipulation sufficient to overbear defendant's will in light of the holding in Hunter. See

32

Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986) (holding that it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect and explaining that although "ploys may play a part in the suspect's decision to confess . . . so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary).

Finally, it is not lost on the court that at the time of the interview, Tangtong had just recently turned 18 years old and that he may suffer, as alleged, from some "emotional problems." ECF No. 49, at 5. However, the record does not allow the inference that such issues rendered Tangtong's confession involuntary. See Vance v. Bordenkircher, 692 F.2d 978, 980–81 (4th Cir. 1982) (confession voluntary even though the defendant was fifteen years old with an IQ of sixty-two, which an expert equated to a mental age of nine); but see, Reck v. Pate, 367 U.S. 433, 440–41 (1961) (finding impermissible that a nineteen year old with subnormal intelligence was subjected for the first four days of his detention to six to seven hour "stretches of relentless and incessant interrogation" conducted by teams of officers). In Hunter, in addition to finding the interview non-custodial, the court held that although the defendant was "upset, often crying, sometimes to the point where she had difficulty breathing," because there was "no evidence that her emotional state was the product of threats or coercion," the fact that she was "thoroughly distraught, appearing at times emotionally out of control," did not render her interview impermissibly coercive. 912 F. Supp. 2d 388, 401–02 (E.D. Va. 2012). Here, as in Hunter, there is no evidence that Tangtong's "emotional problems" or apparent distress, to the extent the court assumes the existence of the former, resulted from any proscribed conduct on the part of the officers.

33

See, e.g., Miller v. Fenton, 796 F.2d 598, 603 (3d Cir. 1986) (confession voluntary even though the defendant "collapsed in a state of shock" and had to be taken to the hospital after confessing); Green v. Scully, 850 F.2d 894, 899 (2d Cir. 1988) (confession voluntary even though the defendant was crying during his confession and a forensic psychiatrist testified that the defendant had an "emotional collapse"). In sum, after thoroughly reviewing the circumstances surrounding the interview at the Tangtong residence, the court finds no evidence that any of the officers used any threats or promises, express or implied, or coercive techniques, such as repeated and prolonged questioning or deprivation of food or sleep, that would offend due process and the render Tangtong's confession involuntary.

## III.

Tangtong's third and final argument for suppressing his statements is that his "due process rights were violated by the efforts to prevent him from speaking with or consulting with his attorney before questioning." ECF No. 49, at 5. Tangtong alleges both that he and his mother both attempted to invoke his right to counsel. He further alleges that officers "advise[d] him that he did not need an attorney" because "their questions were just 'a conversation,' not an interrogation," and advised his mother "that they were not required to wait on an attorney who was representing them on other matters." ECF Nos. 32, at 2 and 49, at 6. For three independent reasons, Tangtong's argument related to his alleged invocation fails. First and foremost, the court finds that there is insufficient evidence to corroborate Tangtong's claim to have invoked his right to counsel. The two testifying federal agents consistently and unequivocally denied that Ethen ever mentioned, let alone requested, an attorney. ECF No. 45, at 58-59, 74. The only evidence that he did so is Ms. Tangtong's

34

exceedingly inconsistent testimony. Ms. Tangtong first testified that, from behind the plywood door to her bedroom, she thought she overheard Ethen ask if he needed an attorney present. ECF No. 45, at 9. Later, when asked directly whether she ever heard Ethen ask for a lawyer, she responded, "I do not recall," "[y]ou would have to ask Ethen." Id. at 35. When asked for the final time whether she heard Ethen say anything to the agents about wanting an attorney present, she responded, "I thought I did, but now I'm so confused. I thought he did." ECF No. 45, at 37.[10] In other words, at most, Ms. Tangtong claimed it was possible that Ethen asked if he needed an attorney, but that it was also possible that she was mistaken on this point. In light of Ms. Tangtong's apparent confusion, the probative value of her testimony regarding Ethen's request for counsel and the officers' alleged attempt to discourage him from availing himself of counsel is substantially diminished. Furthermore, because Tangtong was not in custody at the time he allegedly asked if he needed an attorney, he could not invoke the protections provided by Miranda. Burket v. Angelone, 208 F.3d 172, 197 (4th Cir. 2000) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); see also United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by Miranda cannot be invoked when a suspect is not in custody."); United States v. Bautista, 145 F.3d 1140, 1147 (10th Cir.) ("Thus, in order to implicate the Miranda-Edwards right to counsel prophylaxis, both a custodial situation and official interrogation are required."), cert. denied, 525 U.S. 911 (1998). Third, even if the court were to presume that Ethen was in custody and credit the

---

[10] Ms. Tangtong's testimony is not only inconsistent as to whether she heard Ethen mention an attorney, but her testimony is also inconsistent as to what he said. Ms. Tangtong testified multiple that times Ethen only "asked if he needed an attorney" ECF No. 45, at 18, 42, 43, 44. However, at least once, she stated that Ethen "asked for a lawyer to be present." ECF No. 45, at 10.

testimony that he asked if he needed an attorney, his alleged invocation in the form of a question would not require the officers to discontinue the interview. Under Miranda, a suspect in custody who invokes his right to counsel cannot be subjected to further police interrogation until counsel is present or the suspect initiates further conversation. See Edwards v. Arizona, 451 U.S. 477, 484–85 (1981). However, to invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel. Tangtong's asking if needed a lawyer, ECF No. 45, at 18, would not constitute an unambiguous request for counsel. See Berghuis v. Thompkins, 56 U.S. 370 (2010) (discussing the requirement of unambiguous invocation); Davis v. United States, 512 U.S. 452, 458–62 (1994) (holding defendant's statement "Maybe I should talk to a lawyer" did not invoke the right to counsel because the statement was not clear enough to alert a reasonable police officer that he was requesting an attorney); Mueller v. Angelone, 181 F.3d 557, 565–69 (4th Cir.), cert. denied, 527 U.S. 1065 (1999) (holding petitioner's question to officer, "[d]o you think I need an attorney here," did not constitute unambiguous request for counsel).

Ms. Tangtong also testified that her own attempt to invoke Ethen's right to counsel was disregarded. The record indicates that Ms. Tangtong informed Agent Durham that Ethen's guardian ad litem was an attorney and implied that she may still or could represent him in whatever it was that the officers were there for. When asked by Ms. Tangtong if Ethen needed an attorney present, Agent Durham advised Ms. Tangtong that he was unable to provide legal advice, but that she was free to contact whomever she liked. He further advised Ms. Tangtong that "[w]hoever that attorney is from the previous incident does not

represent him on this matter here today." ECF No. 45, at 58. Neither statement was improper, misleading, or obviously intended to discourage Ms. Tangtong from contacting an attorney. Moreover, because <u>Miranda</u> rights are personal and cannot be invoked by third parties, Ms. Tangtong's conversation with Kegley's secretary does not qualify as an invocation of Ethen's right to counsel. <u>Moran v. Burbine</u>, 475 U.S. 412, 419 (1986). Also, there is no constitutional requirement that police inform a suspect of another's attempt to contact an attorney, or otherwise "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." <u>Id.</u> (citing <u>Oregon v. Elstad</u>, 470 U.S. 298, 316–317 (1985)). In sum, because (1) Ms. Tangtong cannot invoke Ethen's perceived right to counsel, (2) there is no credible evidence that Ethen was verbally or physically restrained from contacting an attorney or dissuaded from doing so, (3) and any invocation outside of the <u>Miranda</u> context does not foreclose further questioning, Tangtongs' final argument for suppression is fundamentally untenable and accordingly must fail.

## IV.

For the aforementioned reasons, the court finds that Tangtong was not in custody when he made the incriminating statements that are the subject of this motion, and further finds that those statements were made voluntarily. With respect to the alleged invocations of his perceived right to counsel, because Tangtong was not in custody, his claimed statement regarding an attorney, even if considered an unequivocal request, does not implicate any constitutionally protected right, and the officers were consequently not required to end the interview. Lastly, because third parties cannot invoke the right to counsel on another's

37

behalf, Ms. Tangtong's alleged invocation does not implicate Ethen's Fifth Amendment right. Tangtong's motion (ECF No. 31) is **DENIED**.

An appropriate Order will be entered.

Entered: 11-27-2018

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge